We will now hear counsel in United States v. Schwartz, and let me just tell our, we have these, you weren't here Mr. Glasser when we introduced our Russian judge guests who The issue for our Russian guests is whether the government has the right, after placing on the record what we call a 5k1.1 motion, which permits the district court to go below the guidelines, district court can always do that, but well that's up in the Supreme Court right now, saying that the defendant cooperated and then when the government finds additional evidence of a continuing violation, in this case sale of drugs, whether the government can withdraw that motion. Essentially that's what's before the court now. Is that a fair summary? Your honor, I think that is a fair summary. Good afternoon, Jeff Lindy on behalf of the College of Justice Schwartz. May it please the court, your honor, I do believe that is a fair summary. In this situation what we have is a plea agreement entered into the district court below. We have a down. Did you reserve time? Oh, I have reserved three minutes. I'm sorry. Thank you. Thank you very much. The down departure motion was filed and then the day before, two days before sentencing, it was withdrawn and what we have argued. Excuse me, we'll say goodbye to the Russian judges and we may see you at lunch if we ever get finished today. Doesn't look like it. I'm sorry, Mr. Lindy, but I hope it wasn't something I said. No, I think they probably have to be someplace at 12. I'm sure, I'm sure. What we're arguing here is that once the down departure, we're arguing that under the fact, and this is important, the facts of this case and the plea agreement of this case as written, that once the government filed the down departure motion, they could not withdraw it. And what we're also arguing- Doesn't it say in the plea agreement specifically? This isn't the case where there's no reference in the plea agreement. There's specific language. This isn't like Padilla. Well, Your Honor, this is actually, in our opinion, this is one step better than Padilla. In Padilla, there is no reference to a 5k, to a withdrawal of a down departure motion. The Second Circuit said because there's no reference, how can the government withdraw a down departure motion in this agreement? There is a reference and the reference is a paragraph 4i. And 4i, it gives the exact circumstance where a down departure motion should be, can be withdrawn. That's page 36 of the joint appendix. You know, I mean, maybe you can respond to the, to your adversary's argument. I mean, I think what your adversary is saying is paragraph 4 deals with basically defining, here's what full cooperation means. Breaking the law is not full cooperation and therefore they can go right to 4i. And I know there are other remedies, but there's also an election remedies paragraph. I understand the nature of these things. They're really government oriented. There's all kinds of things in there, but I mean, isn't that a viable argument by the government? Your Honor, it's a viable argument. And, and, and, and, and, uh, and arguing against Mr. Zausman, who is a former colleague of mine, it's a, not only a viable argument, but a good argument. The problem is it, the argument defies the plain reading of paragraph 4. Of course, when we're talking about a plea agreement, we're in a contractual analysis, but it has to be construed strictly. What we think is going on in paragraph 4 is actually, uh, our analysis, I believe, and I say this humbly and of course respectfully to Mr. Zausman, but I think it's more compelling. Subparagraphs A through H of paragraph 4 pertain to cooperation. It simply defies the common sense reading. If you take paragraph 4 on page 35 of the joint appendix and you say that that first sentence, the defendant agreed to cooperate fully and truthfully with the government as follows, and say that everything that flows from there in paragraph 4 defines cooperation. That's not the case. And when you plainly read paragraph A through H, it talks about cooperation. And what really strikes the point home for us in our interpretation is that what follows H is I. And in I, it says, if the defendant fails to cooperate, a downward departure motion can be withdrawn. In our opinion, and this again is common sense with criminal practice, and I know that this bench is very aware of criminal practice in this district, the worst thing that can happen to the government is a defendant who, in the province of the streets, goes south. A defendant who says, I'm going to cooperate, then takes a stand and says, oh, I don't recognize the defendant's seat at the council table, or refuses to take the stand and says everything I told you before is a lie. That is going south. That is the worst thing. And what is the remedy for the worst thing that a cooperator can do? The remedy is actually you can withdraw a downward departure motion. Again, what hits our point home is what's paragraph J say? Again, I'm now on page 36 of the Joint Appendix. Defendant understands that it is a condition and obligation of this cooperation agreement that a defendant not commit any additional crimes. They're adding an obligation. In addition to your cooperation, Mr. Defendant, you also, and it makes sense, you also can't go out there and These are the remedies we have, and a withdrawal of a departure motion already filed is not one of them. The government used that withdrawal language in paragraph I. The government could have used the withdrawal language in paragraph K at a point that we did not make, I believe, in the brief. If you go to paragraph 5, which is page 38 of the Joint Appendix, 5B3, all the way at the bottom, it again talks about what happens if a defendant commits a crime. After signing a plea agreement, and it again does not mention a withdrawal. Well, it says the government may refuse to file exception 5K1.1. Shouldn't we assume that that encompasses withdrawal of a 5K1.1? Respectfully, I didn't mean to put that out. Respectfully, we say no. What's the difference between not filing it and having filed it, then withdraw it, because he sold meth. I guess it was meth. Yeah, he was using it, distributing it to his roommates. Right, right. I believe that that takes into some of the cases, and I appreciate the court's guidance. You sent us a letter on October 11th, and you cited some cases, Anzalone, for the 8th District, two cases, Butler and Dixon. 8th Circuit, I think. 8th Circuit. Two cases, Butler and Dixon from the 4th Circuit, and the 11th Circuit's Neely case. What those cases deal with, first of all, is the concept of what happens when a defendant, some of the cases deal with what happens when a defendant cooperates. And that's why we believe that if you read paragraph 4, you go to that subparagraph I. If a defendant cooperates, I'm sorry, you go to subparagraph K. If a defendant cooperates, if the government decides to file a downward departure motion and does it, it has to follow through. That's why subparagraph K has that provision under D. The provision under D is that, look, you filed the 5K, you have to file a 5K, you did it, and you obviously felt that that cooperated fully. So what do you now do, says Mr. Zalver, which is a good question. Well, what you do is not what the assistant, it's not Mr. Zalver, what you do is not what the assistant did in the district court below. What you do is just let the 5K stand and say, Judge, you have the 5K. We honor our obligation because he did cooperate fully. But now, Judge, let me tell you about this defendant. And that's what the prosecutor can do. How can you say he cooperated fully when one of the conditions of cooperation was not committing other crimes? Your Honor, our point is that that's not one of the conditions of obligation. That is that the cooperation... 4J says you can't commit other crimes. Right, that's an addition. Perhaps I was misunderstanding, Your Honor, using the term condition. We don't believe that that defines cooperation. We believe it's an additional obligation. Because the letter comes after rather than in A to H? I mean, if it came before, would it make a difference? No, I mean, I do make some point, which I think I'm allowed to, about how Paragraph 4 flows. But most importantly, it's because that J and K simply don't mention withdrawals or remedy. We believe that it's when somebody cooperates and then somehow goes south, refuses to continue the cooperation. That person has committed an egregious offense against the government. If you're right, then Mr. Zausner will make sure, if you're right in this case, Mr. Zausner will make sure that every other plea agreement entered into hereafter will specify withdrawal of the 5K1.1 and what have we accomplished. I mean, you make a much bigger argument, which is the government has all the marbles and they've squeezed this guy and they've used him. I mean, this is a law clerk argument. I just put it out so my law clerks should know I'm listening to them. And the government has squeezed the guy and he's done everything and now they don't need him anymore, which is what your brief says. And therefore, they don't care. But certainly, it's such an easy thing to remedy. Does it really get at the heart of what this guy did, which is he kept on using and he sold. Your Honor, that is why I'm glad the law clerks picked it up. That is why we have the two different arguments. We have the Padilla argument. We also have the Isaac argument. That the government exercised bad faith in this case, we think is clear. I know the government disagrees. I do think that's a more difficult issue for this court. What I don't think is a difficult issue is that what the government should do is, I don't want to tell them the job, but they should re-write this plea agreement that's been floating around in Washington literally for decades. It's the same claim, essentially, that I used, 86 to 89 to 92. The government cites a non-presidential case, ADRAN. I don't know if I'm saying that right. We don't listen to non-presidential cases. Well, thank you, and I'm glad about that. But the only important thing there is that there's language in the Ninth Circuit, in whatever district's involved here, that the government should use because there will be no question because that language says if any part of this plea agreement from paragraph 1 through 100, if any part of that is breached by the defendant, then all bets are off. We're obligated, the government, we're obligated to do nothing. They did not write that here. But it could always be written more clearly. It sounds to me, counsel, like your argument is that this agreement is not a model of clarity, and you may be right on that. It perhaps could be improved, but isn't it true that in 4I, it specifically says if the defendant fails to cooperate, the motion may be withdrawn? And then, cooperation is defined as not committing other crimes. And that's sort of a basic syllogism, right? That if you fail to cooperate, you might lose the motion. And one of the aspects of failure to cooperate is committing crimes. And, Your Honor, on that point, and hopefully this Court knows me well enough, on that point, I do respectfully, and I say this honestly, I do respectfully disagree with you. I don't think that... I'm sure you do. That's your whole argument. I don't think that cooperation is defined as in not committing any additional crimes. I believe this is an additional condition of his cooperation. And again, we go back to strict... I think that the government has to have the feet held to the fire with the strict construction of a plea agreement, because this is not just a regular contract, as we all know. It's a plea agreement. There are factors here that are more important than just a regular on-point commercial contract. I think when looking at that, there is sense in how we're arguing, because again, the most egregious conduct of a defendant is somebody who signs a cooperation plea agreement and then refuses to cooperate. That's the failure to cooperate in paragraph I. Paragraph K has these two... What if he went out and killed someone? Do they still have to go file the 5K motion? This is a cooperating witness, Judge. We know the statutory minimum here is 60 months, but forget the fact that he just killed someone. You know, isn't there a risk from a policy standpoint that if what you're saying is correct on the draft of this agreement, the witness, as long as he snitches or whatever the appropriate word du jour is, he can act with impunity with respect to the rest of the citizenry. Isn't that a danger here? Your policy question in either red light, I would like you to talk, because it's a fascinating... Finish your sentence. It is a fascinating... I'll make a long sentence. I just sat with Justice O'Connor in Newport, and boy, she kept them to the red light. Well, it's a fascinating question, because from a policy standpoint, my retort, respectfully, Your Honor, would be, shouldn't the government be held to the burden of drafting a plea agreement that says what it means? In this situation, in your hypothetical, if they filed now a departure motion, and in a few days between the filing and the sentencing, the defendant killed somebody, under the way this plea agreement is drafted, I think they have to follow it. As to some other plea agreements that are drafted in the other cases that you cited, they wouldn't have to follow it, because those plea agreements, I think, are better drafted. Okay. We understand. I think we understand your position, Mr. Lindy, and you saved some rebuttal time. I did. Mr. Zosmer, if you're able to say, have you changed the plea agreement yet? Not yet, Your Honor. Okay. Well, actually, that goes to, you know, eventually we're going to have to decide this case. Do you think this is something, I mean, is this something that you think should be precedential based on the language that's here? Does this language change? Well, I know, but the language changes all the time, right? Yes. Well, first let me say, for the record, Robert Zosmer, on behalf of the government, yes, Your Honor, this plea agreement is similar to what Mr. Lindy experienced when he was in AUSA in the early 1990s, but it's evolved quite a bit. There's also a lot of local variation, as I'm sure the court is aware, from district to district. This does not come from Washington, because we need to respond to what this court holds in regular opinions. I hope so. Well, we do. We try. Just as an example, there's a, excuse me, a citation of the Barrett case, which really is not pertinent to the issue before the court, but Barrett was one of those episodes about a decade ago where the court said that we had improperly used information given by the defendant then to try to increase his sentence. You'll now look at our plea agreement and see that we addressed that issue every which way from Sunday in response to this court's decision in Barrett. We could do it again. There's one other thing that we could do to solve this unusual problem, and this touches on what Judge Hartman was saying. Thanks, Mr. Lindy. That's about, excuse me, the timing of when the motion is filed. The district court has made it very clear to us, some by rule, some by practice, that they want the motion a week before the sentencing so that the district judge can prepare. That's what caught us here, that the motion was filed as the district court logically requires before the prosecutor knew that this fellow was going to be arrested the next day. How did that happen? It seems very curious to me in terms of timing, that they went to search the day after he filed the, wasn't it the day after he filed the 5K? Well, the coincidence was the government was filing his 5K motion exactly one week before the 5K, and that's standard practice. On the same day it happens, the pretrial officer was making her petition to the district court to revoke the defendant's bail because he was continuing to use narcotics. Well, you knew that. And we knew that. I mean, yeah, he makes a very good point on the using. I don't think you can get very far on the fact that he was using. You knew he was using all through. Absolutely, and the government made a conscious decision that he did provide valuable information about other people that led to other arrests. And we were going to tolerate that. We were going to bring it to the attention of the court, but make our discretionary decision that he should get a 5K motion. But coincidentally, on the same day that it's filed, the pretrial officer gets the warrant to revoke his bail because he's continuing to violate the conditions of release. The next day, the agents go to arrest him on this warrant that's issued by the court. And lo and behold, there's 22 grams of methamphetamine hidden in a pill bottle that he's trying to swallow. Now it's clear that he's not just using. He has crossed a very significant line. He is still a dealer. And at that point, the government has to make a new decision, which is do we stomach this? And the answer is no. I will quote again what Judge Hardiman focused on, which I think is the key to the whole thing. Cooperation is defined in the agreement as including not committing new crimes. I didn't ask, Mr. Lind. I should have, but I'll ask you. If you had done what Mr. Lindy suggested, i.e. go along with your, not withdraw the 5K1.1, but said to the court, look, in sentencing this guy, we want you to know that we have since learned that he's selling, would you have violated the plea agreement by, in other words, I mean, I think Mr. Lindy would then come back to us and say once they file a 5K1.1, they can't withdraw that by arguing against it. Well, probably not. I mean, the precedent of this court is that the government can argue against its own motion. Your Honor, I think most recently in the Floyd case, wrote an opinion along those lines. I think Judge Chigaris was on the panel as well. So that's fairly well settled. I doubt we would hear that argument. But what we could do, and what I was getting at at the beginning, if we want to change our practice, is we could wait until the last minute to file these motions, if that's what we're up against. Or you could put everything into the plea agreement. Right, right, or change the plea agreement. To every possible detail. But the construction that's being urged is not a fair construction of the plea agreement. The condition that a person not commit new crimes while cooperating goes to the essence of cooperation. How can the government be dealing with somebody putting them on the street to provide information against other people while they're continuing their criminal activities? And how can the government then call such a person as a witness? Don't we have to parse that a little, though? Because technically, using is a crime, is it not? It is. And wouldn't you concede that if you're a cooperating witness for whom you went to bat, opposing pretrial services' motion to revoke bail, who you knew was using, wouldn't you have to concede that if it was just a usage situation, consistent conduct over a period of time, that your withdrawal of the 5K motion would be contrary to the plea agreement? I would not agree with that. I think in this case... Well, then you're trying to have it both ways, aren't you? If I may. The government could have decided here not to file a 5K based on the drug usage. And such decisions have been made. But you can't have him out there operating for you for months and months. And the reason he's operating on your behalf as your agent is to cooperate and help himself and then pull the rug out from under him at the end. Is that right? I agree. There would be a strong bad faith argument if, in this case, knowing what we knew about the drug use, we had not filed the 5K on August 11th as the government did. Once we made that decision that we were going to tolerate this, which is within the government's discretion, your honor is absolutely right. And that would have been improper. But the government carried through. It filed the motion. And that's what I know. I'm jumping around here a bit with the different questions. That's what answers the bad faith claim here. The bad faith claim is that, well, they knew he was using it. So they must have known he was getting the money from somewhere. Yeah. Let's go to that point. I was going, Mr. Lindy ingeniously writes, well, they knew he wasn't working. And therefore, they knew he had to live. And therefore, they must have known that he was also selling. And this guy was a pastry chef, pretty high salary. But he wasn't apparently working at the moment as a pastry chef. Was it in one of the high class restaurants? In fact, I think it was the Bec Frack. It was, your honor. Yeah. How do you answer that? Well, the district court found that the government did not act in bad faith. And that was not clearly erroneous here. No, that's not my question. How do you answer Mr. Lindy's argument that not only did you know that he was using, but you must have known that he was also selling? I think that's Mr. Lindy's argument. Two answers. It's a clever argument. But number one, it's not a logical syllogism. Because there are many, many people who use drugs. Unfortunately, we see many positive results while people are on release. It cannot be concluded that all of them are selling drugs. People have money from public assistance, from family, from savings. We can't go about assuming that everybody who's on bail right now, who unfortunately continues to suffer from an addiction, is selling drugs. I don't think it is a fair assumption. The second answer, though, what completely, I think, defeats the bad faith argument is this one fact, that the government filed the 5k motion. If there was nefarious bad faith here, such that the government, as it's laid out in the defense brief by my very able friend, if the government's point here was to use the fellow, get all these convictions, do everything it could, and then leave him by the side of the road, you don't even file that 5k motion. Obviously, the government was acting in good faith in overlooking the drug use or deciding that it could tolerate it, filed the 5k, but then the next day found out that information across the line that just couldn't be tolerated, which is he had a very substantial amount of distribution quality, quantity of methamphetamine. Gets us back to the plea agreement and gets us back to the first issue of is the government allowed to withdraw it? And it just has to be at that point. It cannot be in a reasonable reading of the agreement, which says that cooperation includes the condition of not committing crimes. It cannot be that once the government files the motion, it's a starter's pistol for the defendant, who can then say, well, my ship has come in and I now have a week before sentencing that I can rob and pillage and even murder, as Judge Harmon suggested. It's not, his court has said, but I do want to give one apology to the court in a case called Swint in 2000, which is cited in the defense brief and we overlook citing it in our brief, but it strongly supports the government's position. Swint was very similar. He didn't have a withdrawal, but he did have somebody who withdrew, I'm sorry, somebody who committed new crimes and the government decided not to file a plea agreement and the argument presented to this court was a similar parsing of the plea agreement of, well, you didn't say, don't commit crimes in the same sentence where you said we're going to evaluate your substantial assistance and what this court said in Swint, it's 223F3-239. Yeah, who wrote that? Do you remember? I do not. It was none of the members of this panel. You looked that up? Yeah, I think Judge Nygart was on the panel. I don't recall who wrote it, but what the court said was, we find the government's decision not to move for a downward departure manifestly consistent with any reasonable understanding of this plea agreement. By contrast, Swint's construction of the agreement makes little sense in light of the agreement's clear purpose. This court has rejected other tortured and illogical interpretations of plea agreements and we do the same here. I would suggest that that passage directly applies to this case. The last thing I want to mention, I actually meant to start with this, but we had so many interesting issues to discuss, is the fact that there is... You mean interruptions by the panel? No, no, no. Well, I also have things that I want to say after Mr. Lindy's very, very excellent argument, but there is an appellate waiver in this case and that is what I think comes right up, comes right at the top. If the government, they argue the government wasn't acting in good faith. If the government wasn't acting in good faith, we have never held that the appellate waiver would preclude us from considering the merits of the argument. Well, the court hasn't addressed it one way or the other. Well, if there's a breach of an agreement though, then other provisions in the agreement, including the appellate waiver, should fall by the wayside as well. It's all wrapped up. It's all one. I don't think you've gone very far with the appellate waiver in this case. Well, I don't need to argue much further. Let me just say for the court that this court has not gone that far and other courts have refused to go that far. The Seventh Circuit in particular has been very explicit in addressing this and saying that it's not that if any part of the plea agreement isn't enforced, that the entire agreement falls, including the appellate waiver. Well, it might be a materiality consideration, but clearly the 5k motion is, that's about as material as it gets. But generally what courts have said is that issues that go to the validity of the plea itself will not stop, will not foreclose the waiver. They must be addressed before a waiver goes into effect. But here the defendant's not trying to withdraw his plea. He's not saying that this was unknowing or involuntary and the appellate waiver remains an important material part. So I will say that, but I think we have a very strong position with respect to the merits as well. Now the court had also asked the parties to address these cases. I don't know if you briefly want to do that. I've sort of touched on it. The Anzalone case is the one troubling case for the government's position from the Eighth Circuit. That case has been rejected by every other circuit to consider it, including the Fourth, the 10th, the 11th. The Eighth Circuit itself, in a case called Ziesman, Z-I-E-S-M-A-N-409-F3-941, has essentially limited Anzalone to its facts that I think recognize. The basic error in Anzalone is that it says that in considering substantial assistance, the government can only consider the assistance and nothing else. That is inconsistent with the Supreme Court's decision in Wade, which says that the government does not have to file a 5K motion even when there is substantial assistance. If it has discretion, it's inconsistent with this court's precedent in Isaac. So I think that we've all had a basic agreement as to the basic principles here, the basic principles that the government has discretion not to file a 5K if it's acting in good faith within the agreement. And this agreement explicitly said that cooperation must include not committing crimes. If there are no further questions, I appreciate the court's attention. Thank you. Mr. Lindley? Thank you. Very briefly, if I may. Swint, we did address Swint at page 38 of our brief. We do point out that Swint is rather different in that in Swint, there's an explicit warning. It's different in San Juan. In Swint, there's an explicit warning. Prosecutor says to the defendant, hey, look, you do it one more time, you're done, right? No cooperation, forget it. Plea agreement's gone, okay? And that's what they did. So that's different in a way that's obviously different in that we don't have a warning about dealing drugs. But what I would say, and again, Mr. Zauffer was not in the court below with me and with the assigned prosecutor. At the second hearing, as well as at the first hearing, the prosecutor said to my client, and we were at Sidebar, and there's a reason why we're at Sidebar, so the numbers would be on the record. And he says, look, to me, you tell your client, he can't do it again. After the second hearing, he said it again to my client, but what's the if? What can't you do again? The defendant couldn't do drugs again. He did do drugs again, and the timing, I didn't bring it up here. The timing of his doing drugs is very important, and the government doesn't pick up on this. The third bail revocation motion is filed on August 8th of 2005. Three days later, on August 11th, the government filed a departure motion. But the government sucked it up and said, all right, we're willing to tolerate that. Well, we're willing to tolerate that, yes, they did. They wouldn't do it otherwise they wouldn't file the 5k1.1. Absolutely right. But in Swint, the prosecutor held good to his word. He said to the defendant, you do it again, I'm not on your team. Or you're not on my team. I'm not on your team. He didn't do that. That didn't happen here. And again, the only other point, and we've been through this before, is that I just think it strains the reading of paragraph four under the whole plea agreement to say that a definite part of the definition of cooperation is to not commit a further crime, because that will make every single subparagraph in paragraph four  It's just not set up that way. So it's over-inclusive. It would be over-inclusive. And you see that in paragraph five. You see that in paragraph five. Because again, it says if the defendant commits another crime, we don't have to file a motion. Would you have argued if he kept the 5k1.1 and they came before the judge and they said, look, judge, we may have filed this, but since that time, we want you to know that not only is he using, he is selling this stuff. Would you have said that violates their agreement? Would I have been upset? Yes. Would I have, would I have thought that was a justiciable argument before the court? No, because the court's rulings on that are clear. I mean, the government's allowed to file a motion and then step away from the motion. Indeed, their plea agreement provides for that. The red light is on, but in terms of the decision. No buts. No buts. OK, thank you. Thank you. Not us. Thank you. Thank you.